CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
October 07, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| MARCUS MONCHÉRY, ) | |
|     Plaintiff, ) | Civil Action No. 7:23-cv-00461 |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| ) | By:    Joel C. Hoppe |
| ROBERT DRYDEN, ) | United States Magistrate Judge |
|     Defendant. ) | |

Plaintiff Marcus Monchéry, a former Virginia inmate appearing pro se, filed this civil rights action under 42 U.S.C. § 1983 against Defendant Robert Dryden, a medical provider at Northwestern Regional Adult Detention Center ("NRADC").[1] Monchéry claims that Dryden was deliberately indifferent to his serious medical needs, in violation of his constitutional rights, when Monchéry sought help for a knee injury while confined at NRADC, first as a pretrial detainee and then as a convicted inmate. Compl., ECF No. 1; see Def.'s Br. in Supp. Ex. E, ECF No. 40-5. Specifically, Monchéry alleges that Dryden failed to order timely or adequate diagnostic scans of his knee and prescribed anti-inflammatory medication that caused Monchéry stomach pain and rectal bleeding. Compl. 6–7.

This matter is before the Court on Dryden's motion for summary judgment. ECF No. 39. Dryden argues that Monchéry has failed to establish any cognizable constitutional claim against him on the undisputed material facts. Def.'s Br. in Supp. 2, ECF No. 40. The parties have fully briefed their positions. ECF Nos. 40, 43, 44. Monchéry also submitted medical and administrative records after briefing was closed. ECF Nos. 46, 48, 51, 53.[2] Accordingly, the

---

[1] Monchéry was detained at NRADC when he filed this lawsuit in July 2023. ECF No. 2. He has since been released from custody of the Virginia Department of Corrections. See ECF Nos. 24, 45.

[2] Dryden argues that the court should "not consider" Monchéry's additional evidence "for any purpose, including . . . Dryden's Motion for Summary Judgment" because it was untimely filed under this district's

motion is ripe for disposition and can be decided without a hearing.[3] For the reasons explained below, Dryden's motion for summary judgment, ECF No. 39, will be granted.

I. The Legal Framework

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a genuine factual dispute exists "if there is evidence such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 283.

---

local rules. Def.'s Resp. to Pl.'s Filings, ECF No. 49, at 1–2 (citing W.D. Va. Civ. R. 11(c)(1)). Monchéry did file his additional evidence several months after the deadline prescribed by local Rule 11. *See* W.D. Va. Civ. R. 11(c)(1) (requiring that a responsive brief and "supporting documents" be filed fourteen days after service of a movant's opening brief unless the court sets out an alternative schedule). But, he has previously expressed a desire to "obtain more evidence . . . to prove further that [his] Eighth Amendment [rights] were violated." Pl.'s Mot. for Appt. of Counsel, ECF No. 36, at 1; *see also* Mot. for Extension of Time, ECF No. 37, at 1 (same). Acknowledging that Monchéry was incarcerated and is representing himself, the Court will consider Monchéry's evidence submitted after briefing to the extent that it is relevant and material to summary judgment. *See Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021) (reversing summary judgment where district court declined to allow pro se prisoner plaintiff to submit further evidence after denying his request for appointment of counsel that was "based in part on the need for 'investigation'"); *Shaw v. Foreman*, 59 F.4th 121, 132 (4th Cir. 2023) (reversing summary judgment where district court issued proper *Roseboro* notice but failed to allow pro se prisoner plaintiff to develop the record after he "expressed a desire to investigate the Prison Officials' evidence, impliedly seeking discovery"); Fed. R. Civ. P. 56(d).

[3] This case is before the undersigned Magistrate Judge on the parties' consent under 28 U.S.C. § 636(c). ECF Nos. 22, 23. The Court notes that Dryden's signature is missing from the copy of the consent form in the record. *See* ECF No. 22. But Dryden has expressly stated that he consents to the undersigned handling this matter through entry of judgment. *See, e.g.*, Def.'s Br. in Supp. 3 ("[B]oth parties consented to have this case transferred to Magistrate Judge Joel C. Hoppe."); *see also Roell v. Withrow*, 538 U.S. 580, 587 (2003) (holding that § 636(c)(2) empowers magistrate judges to hear civil cases by consent regardless of the form of consent "so long as the parties have in fact voluntarily consented").

The party moving for summary judgment bears the initial burden of showing that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c), (e). Where, as here, a defendant moves for summary judgment on a plaintiff's claim against him, the defendant need only "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325; *see* Fed. R. Civ. P. 56(c)(1)(B). The defendant may also cite "particular parts of materials in the record" to support his position. Fed. R. Civ. P. 56(c)(1)(A). Once the defendant meets his burden, the plaintiff must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In deciding a motion for summary judgment, the Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 255. However, the nonmoving party "cannot merely rely on matters pleaded in the complaint, but must, by affidavit and the like, respond to the motion." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (citation omitted); *see* Fed. R. Civ. P. 56(c)(4).[4] Nor can the plaintiff rely on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Johnson v. Robinette*, 105 F.4th 99, 113 (4th Cir. 2024) (citing *Anderson*, 477 U.S. at 252).

***

---

[4] A complaint or brief is treated as the equivalent of an affidavit and may be considered at summary judgment if it is "*verified*" and "the allegations contained therein are based on personal knowledge." *Goodman*, 986 F.3d at 498 (cleaned up). A complaint or brief is verified if it is "signed, sworn, and submitted under penalty of perjury." *Id.* at 495 n.2. While verification does not require an "explicit statement" that the drafter "declare[s] under penalty of perjury" that the document's contents are true, the document must at the very least be "sworn" before a notary. *Id.*; *see Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").

3

Monchéry brings a single count under 42 U.S.C. § 1983, asserting that Dryden was deliberately indifferent to his serious medical need. To make out a claim for deliberate indifference to a serious medical need, a plaintiff must establish two elements. First, the plaintiff must demonstrate that he had an objectively serious medical need. *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An objectively "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation omitted).

The second element, which involves the defendant's awareness of the medical need, is subjective or objective depending on whether the plaintiff was a convicted prisoner or pretrial detainee at the time of the violation. *See Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015) (establishing a purely objective standard for excessive force claims brought by pretrial detainees, distinct from the subjective standard for such claims brought by convicted prisoners); *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (holding that "*Kingsley*'s objective standard extends not just to excessive force claims; it applies equally to deliberate indifference claims" and abrogating Fourth Circuit precedent to the contrary).

Under the longstanding Eight Amendment standard for a convicted prisoner, the plaintiff must show that the defendant acted with a "sufficiently culpable state of mind." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This requires a showing that the defendant "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the [defendant's] action or inaction." *Jackson v. Lightley*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Farmer*, 511 U.S. at 837–39). It is

not enough that the defendant "should have known" about this risk—he must both have known and consciously disregarded it. *See id.*

On the other hand, the Fourteenth Amendment standard for a pretrial detainee is purely objective, requiring a lesser showing that the "defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known *or so obvious that it should be known*.'" *Short*, 87 F.4th at 611 (quoting *Farmer*, 511 U.S. at 836) (emphasis added). While this is a lower bar than that for an Eighth Amendment claim, "it is still not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611–12. On the contrary, the plaintiff must show that the defendant "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed" and that such "action or inaction posed an unjustifiably high risk of harm." *Id.* at 611.

Whether a claim is brought under the Eighth or Fourteenth Amendments,[5] it is well established that mere disagreements between an inmate and a medical provider over the proper course of diagnosis or treatment "fall short of showing deliberate indifference." *Jackson*, 775 F.3d at 178; see *Farabee v. Gardella*, 131 F.4th 185, 194 (4th Cir. 2025) ("The Constitution does not provide a right to specific medication or preferred treatment."). Rather, "a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort" to care for the complained of condition. *Compton v. Wang*, No. 7:21-cv-478, 2023 WL 583517, at *6 (W.D. Va. Sept. 8, 2023) (citation omitted); *see Wright v. Collins*, 766 F.2d 841, 849 (4th Cir 1985)

---

[5] In announcing the objective standard for a pretrial detainee's Fourteenth Amendment claim of deliberate indifference, the Fourth Circuit was clear that the test differs from that for an Eight Amendment claim "in only one respect," that "the plaintiff no longer has to show the defendant had *actual knowledge* of the detainee's serious medical condition." *Short*, 87 F.4th at 611. Accordingly, unless in tension with the objective test, precedent applicable to Eighth Amendment deliberate indifference claims remains applicable to their Fourteenth Amendment counterparts. *See, e.g.*, *Hammock v. Watts*, 146 F.4th 349, 361 (4th Cir. 2025) (citing Fourth Circuit precedent decided under the Eighth Amendment despite considering the plaintiff's claim under *Short*'s Fourteenth Amendment test).

5

("Negligence or medical malpractice in the provision of medical services does not constitute a claim under § 1983.").

## II. Background

A.   *Summary of Allegations & Claim*

The following summary draws from Monchéry's unverified complaint, ECF No. 1, and evidence in support of his complaint, ECF Nos. 4, 6, 10 [hereinafter Compl. Exs. 1–3]. Where helpful for context, the Court also references Monchéry's unverified brief opposing Dryden's motion for summary judgment. ECF No. 43.

Monchéry's sole § 1983 claim stems from events that occurred while he was confined at NRADC and seeking treatment for knee pain. *See* Compl. 3, 5–7. Monchéry does not address the origin of his knee problem in the complaint, but suggests in later briefing that he first injured his knee while playing sports or working out on an unknown date. *See* Pl.'s Br. in Opp'n ¶ 5. Monchéry first saw Dryden for "swelling to [his] left knee" on September 13, 2022. Compl. 5. Dryden told Monchéry that there was "nothing torn" in his knee, prescribed him "some pain medication . . . along with some naproxen for the inflammation," and instructed Monchéry that he could return to his physical exercise routine. *Id.*

On September 27, 2022, Monchéry put in a medical request for "something stronger" and an MRI scan of his knee because "the swelling hadn't gone down" despite taking the medication Dryden prescribed. *Id*. At a follow-up visit on October 6, 2022, Dryden told Monchéry that "he didn't think an MRI was necessary because there was no indication that anything was torn." *Id.* Monchéry said that he "thought there was a more serious issue and wanted an MRI," but Dryden declined to order the scan. *Id.* Instead, he "switched [Monchéry's] medication" and again instructed him that he could return to his exercise routine. *Id.*

Monchéry "quit working out for a few months and just took the meds." *Id.* Eventually, believing his knee had recovered, Monchéry "tried doing some duck walks." *Id.* But he "noticed a popping sound after a few sets" and stopped. *Id.* The next day, his "knee was swollen again." *Id.* at 5–6. Monchéry saw Dryden for a third appointment on January 31, 2023.[6] *Id.* at 6. Dryden told Monchéry "the same thing"—that he did not believe an MRI was necessary—and prescribed further medication. *Id.*

On March 3, 2023, Monchéry put in another medical request, and he saw Dryden for a fourth appointment on March 7. *Id.* Monchéry again requested an MRI and expressed concern about the seriousness of his knee injury. *Id.* Dryden again declined to order an MRI and prescribed medication. *Id.*

After the appointment, Monchéry "took the meds for a couple months and noticed no changes in his knee," so he "gradually stopped taking them." *Id.* He later began experiencing "really bad stomach pains" and "noticed blood on the tissue" after using the bathroom. *Id.* Monchéry saw other providers for his stomach pain and rectal bleeding in May and June of 2023. *See id.*; Compl. Ex. 1, at 9–12.

Monchéry next saw Dryden for his knee on June 13, 2023. Compl. Ex. 1, at 13. At the appointment, Dryden ordered an X-ray of Monchéry's knee. *Id.* A radiologist conducted the X-

---

[6] In his complaint, Monchéry appears to conflate two different appointments with Dryden: one on January 31, 2023, and the other on March 3, 2023. *Compare* Compl. 6 (omitting reference to January appointment); *with* Compl. Ex. 2, at 19 (medication chart noting that Dryden prescribed Monchéry medication on January 31). Monchéry acknowledged in his complaint that he was missing records of certain relevant medical appointments and that he would "send copies . . . when he receive[d] them." Compl. 6; *see also* Compl. Ex. 3, at 1 ("I'm trying to get copies of my medical records from March 15, 2022 to January of 2023."). Monchéry's medical records have been submitted by the parties, and it does not appear that Monchéry intended to omit the January date. In any event, Monchéry did not object to Dryden including the January 31, 2023, appointment date as an "undisputed fact" in his briefing. *See* Def.'s Br. in Supp. 4 ¶ 6.

7

ray on June 17, 2023. Compl. Ex. 2, at 1. Less than a month later, on July 4, 2023, Monchéry drafted the complaint in this matter. *See* Compl. 4.

Monchéry claims that Dryden was deliberately indifferent to Monchéry's "serious medical needs" in violation of the Eighth Amendment. *Id.* at 6–7. Specifically, Monchéry asserts that Dryden "refus[ed] to provide [him] with adequate medical treatment" by declining to order an MRI and waiting nine months after Monchéry's first complaint of knee pain "just to order an x-ray" despite Monchéry's repeated requests for diagnostic scans. *Id.* at 7–8. Monchéry further alleges that Dryden prescribed "harmful, ineffective, or counter-productive" medication that failed to treat his knee injury and that his "sharp stomach pains and rectal bleeding was the result of the continued administering" of the medication. *Id.* at 8. According to his complaint, Monchéry suffered "mental and emotional distress because of the frustration, helplessness, anguish, and pain and suffering." *Id.*

Monchéry filed his complaint in the Eastern District of Virginia on July 19, 2023, and it was subsequently transferred to this district on a finding of improper venue. *See* Mem. Order, ECF No. 4, *Monchéry v. Dryden*, 3:23-cv-462 (E.D. Va. July 26, 2023). Once the case was before this Court, Monchéry submitted a letter referencing parties and claims unrelated to the medical care he received at NRADC and seeking to amend his damages sought. ECF No. 9, at 1. The court liberally construed the letter as a motion to amend the complaint and allowed Monchéry to increase his damages sought, but denied any implicit request to join unrelated parties and claims. ECF No. 16.

B.   *Summary of Dryden's Declaration & NRADC Records*

In support of his motion for summary judgment, Dryden submitted a sworn declaration, Def.'s Br. in Supp. Ex. A, ECF No. 40-1 [hereinafter Dryden Decl.]; medical records

8

documenting Monchéry's treatment at NRADC, *id.* Ex. B, ECF No. 40-2 [hereinafter Med. R.]; administrative records of Monchéry's grievances against Dryden at NRADC, *id.* Ex. C, ECF No. 40-3 [hereinafter Admin R.]; administrative records of Monchéry's grievances against medical providers at the Virginia Department of Corrections when Monchéry was no longer under Dryden's care, *id.* Ex. D, ECF No. 40-4 [hereinafter VDOC R.]; and the dockets for the state court criminal charges on which Monchéry was initially detained at NRADC, *id.* Ex. E, ECF No. 40-5 [hereinafter State Ct. Dockets].

Dryden attests that he is a licensed physician assistant ("P.A.") who has practiced primary care medicine since 1994 and provided care to confined individuals since 1999. Dryden Decl. ¶ 1. When Monchéry first saw Dryden for complaints of swelling in his left knee on September 13, 2023, Monchéry "reported no injury," stating only that he "work[s] out." *Id.* ¶ 5; *see* Med. R. 2 ("C/O swelling in (L) knee. No injury. 'I workout.'"). Dryden examined Monchéry's knee and observed that the knee had no effusion, was clinically stable, and had an active full range of motion within normal limits. Dryden Decl. ¶ 5; Med. R. 2. Based on these observations, Dryden recorded a diagnosis of "knee swelling" and prescribed 220 mg Naprosyn (naproxen), a non-steroidal anti-inflammatory medication, twice daily for 30 days. Dryden Decl. ¶ 5; Med. R. 2.

On October 6, 2022, Dryden observed "mild[]" tenderness on the "lateral joint line," but continued to find that there was no effusion in the knee and that Monchéry retained a full active range of motion. Dryden Decl. ¶ 6; Med. R. 2. Dryden recorded an assessment of "knee pain, possible meniscal origins," and he prescribed Monchéry a different anti-inflammatory, 50 mg diclofenac twice daily for 30 days. Dryden Decl. ¶ 6; Med. R. 2.

Monchéry complained about "swelling and pain" in his left knee to a nurse on January 30, 2023, but he declined the ibuprofen that she offered and asked to see a doctor or physician

9

assistant. Med. R. 2. The nurse's exam notes show that Monchéry's left knee exhibited "moderate" swelling and "limited" range of motion. *Id.* (Assessment: "Alteration in comfort"). Dryden saw Monchéry the next day. Dryden Decl. ¶ 7; Med. R. 2. Monchéry reported left knee pain, but "[n]o recent injury," and mentioned that he "did some duck walks." Dryden Decl. ¶ 7; Med. R. 2. Dryden's "[e]xamination findings were identical to those in September 2022." Dryden Decl. ¶ 7. He prescribed fish oil and another 30-day course of 50 mg diclofenac twice daily. Dryden Decl. ¶ 7; Med. R. 2.

On March 4, 2023, Monchéry told a nurse that the diclofenac had not helped and that "he was still having discomfort in his left knee." Dryden Decl. ¶ 8; Med. R. 12. The nurse referred Monchéry to Dryden. Dryden Decl. ¶¶ 8–9; Med. R. 10. At the appointment on March 7, Monchéry reported "left knee pain" and mentioned that "he had been playing basketball lately," but he "denied any injury." Dryden Decl. ¶ 9; Med. R. 10. Dryden found "diffuse tenderness" in Monchéry's knee but concluded that the knee was "clinically stable" and discharged Monchéry with prescriptions for 220 mg Naprosyn, fish oil, and 2 mg tizanidine, a muscle relaxer. Dryden Decl. ¶ 9; Med. R. 10.

At Monchéry's next medical visit on May 26, 2023, he told a nurse that he had "wiped blood after a bowel movement about three times over the past month." Dryden Decl. ¶ 10; Med. R. 8–9. Monchéry acknowledged that he had a history of hemorrhoids, but he told the nurse that he felt this blood was "something different" and asked to see a provider. Dryden Decl. ¶ 10; Med. R. 8–9. On May 30, 2023, Monchéry saw Patrick Ober, P.A., for his rectal bleeding. Dryden Decl. ¶ 11; Med. R. 7. Ober observed that Monchéry had a "soft nontender abdomen," noted he refused a rectal exam, and discharged him with an assessment of "[p]ossible hemorrhoids" and a plan to start Monchéry on Colace, a stool softener. Dryden Decl. ¶ 11; Med.

R. 7.

On June 11, 2023, Monchéry once again complained to a nurse about pain in his left knee. Dryden Decl. ¶ 12; Med. R. 5. In Monchéry's medical records, the nurse noted his report of knee pain, observed that he was "refusing naproxen and tizanidine," and deemed Monchéry's complaints non-urgent and not requiring further medical referral. Dryden Decl. ¶ 12; Med. R. 5. Nevertheless, Dryden saw Monchéry on June 13, 2023, and assessed that his knee remained "clinically stable" with no swelling or effusion and a full range of motion. Dryden Decl. ¶ 13; Med. R. 4. Among "possible" diagnoses, Dryden noted again that the knee injury could be "meniscal" and ordered an X-ray to narrow down the origin of the injury. Dryden Decl. ¶ 13; Med. R. 4. Four days later, a radiologist conducted the X-ray and found "no effusion, fracture, dislocation, erosion, or foreign body." Dryden Decl. ¶ 14; Med. R. 13. The X-ray report notes an "impression" of "normal left knee and patella." Dryden Decl. ¶ 14; Med. R. 13.

On July 16, 2023, Monchéry filed an "Inmate Request Form" claiming that Dryden "lied" by noting in Monchéry's medical records that there was no swelling or effusion at the June 13 appointment. Dryden Decl. ¶ 15; Admin R. 3. On July 20, 2023, he filed an "Inmate Grievance Form" repeating the accusation that Dryden "lied" in his notes about the June appointment. Dryden Decl. ¶ 16; Admin R. 2. Monchéry also complained that his knee was still swollen and that Dryden had refused his requests for an MRI and not ordered an X-ray until nine months after first examining his knee in September 2022. Dryden Decl. ¶ 16; Admin R. 2. Monchéry stated at the end of the grievance form that he "no longer want[ed] any medical assistance because the [sic] have been deliberately indifferent to my medical needs." Admin R. 2.

Dryden attests that he personally "examined [Monchéry], addressed and managed his symptoms, and ordered interventions, treatment and radiology studies based on history and

11

physical findings." Dryden Decl. ¶ 20. He further notes that Monchéry's complaints of stomach pain and rectal bleeding were addressed by "another PA with stool softeners and fiber supplements," not by Dryden himself. *Id.* ¶ 19.

C.    *Nature of Confinement*

The parties agree that the relevant interactions between Monchéry and Dryden occurred between September 2022 and June 2023 while Monchéry was confined at NRADC. *Compare* Compl. 6–7 (Monchéry's allegations); *with* Def.'s Br. in Supp. 4–6 (Dryden's statement of facts). Because the proper standard for a claim of deliberate indifference depends on whether the plaintiff was incarcerated post-conviction or detained pending trial at the time of the alleged constitutional violation, the court will address the nature of Monchéry's confinement during the relevant period.

When Monchéry first saw Dryden for his knee pain on September 12, 2022, Monchéry was a pretrial detainee with two criminal charges pending before the Winchester Circuit Court. *See* State Ct. Dockets.[7] After a trial on February 13, 2023, a jury returned a guilty verdict against Monchéry on both charges. *Id.* The Winchester Circuit Court then sentenced Monchéry on April 18, 2023. *Id.* Following sentencing, Monchéry remained at NRADC as a convicted inmate until he was transferred to the custody of the Virginia Department of Corrections at the Baskerville Correctional Center on December 6, 2023. Med. R. 15 (medical intake form); *see* Pl.'s Notice of Change of Address, ECF No. 24, at 1.

---

[7] Dryden requested that the Court take judicial notice of the dates on the docket sheets for Monchéry's state criminal charges. Def.'s Br. in Supp. 2 n.1. The Court has done so. *See* Fed. R. Evid. 201(b)(2), (c)(2) (allowing a court to take judicial notice of a fact that "is not subject to reasonable dispute" because "it can be accurately and reasonably determined from sources whose accuracy cannot reasonably be questioned"); *see also Hoye v. Clark*, No. 7:14-cv-124, 2015 WL 3407609, at *12 (W.D. Va. May 27, 2015) (holding that "it was not improper for the magistrate judge to take judicial notice of the court records" in plaintiff's related state court case at summary judgment stage of plaintiff's § 1983 claim).

Accordingly, of Monchéry's five appointments with Dryden referenced by the parties, three occurred before his state court trial and four occurred before his sentencing. *Compare* Compl. 6–8, *and* Def.'s Br. in Supp. 3–7, *with* State Ct. Dockets.

### III. Discussion

Dryden has moved for summary judgment on Monchéry's § 1983 claim, arguing that there is no genuine dispute as to any material fact and that Monchéry's complaint fails as a matter of law to establish Dryden's deliberate indifference to a serious medical need. Dryden points out that Monchéry's allegations of serious pain and inadequate medical treatment are "purely conclusory" and "without evidentiary support." Def.'s Br. in Supp. 9–10; *see also* Def.'s Reply Br. in Supp. 3 (noting that Monchéry's allegations were "not made under penalty of perjury so cannot be considered as evidence"). Dryden further argues that the objective evidence reveals "little more than a disagreement with PA Dryden's recommended course of treatment," falling short of the standard for deliberate indifference. Def.'s Br. in Supp. 9; *see id.* at 9–17 (addressing both elements of a deliberate indifference claim with citations to Dryden's declaration, medical records, and the complaint). Dryden has thus met his initial burden, which requires only that he "point[] out … an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325

The burden shifts to Monchéry, who must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co*, 475 U.S. at 586–87. In response to Dryden's motion, Monchéry first argues that there is a genuine dispute as to the treatment he received because Dryden "lied" in his medical records about the history of Monchéry's knee injury, whether Monchéry had been exercising during his treatment, the extent of "fluid built up around [his knee]," and the frequency of his complaints about his knee. Pl.'s Br. in Opp'n ¶¶ 2,

13

4–6. But Monchéry's complaint and brief in opposition to summary judgment are not verified. *See* Compl. 4 (including signature and date but no evidence of verification); Pl.'s Br. in Opp'n 5 (same). Accordingly, neither can be considered for purposes of summary judgment. *See Goodman*, 986 F.3d at 499.

***

Monchéry next argues that Dryden's failure to order an MRI, eight-month "delay" in ordering an X-ray after assessing Monchéry's knee injury as having possible "meniscal origin" in October 2022, and administration of "harmful, ineffective, or counter-productive medication" could persuade a jury that Dryden was deliberately indifferent to Monchéry's serious medical needs. *See* Pl.'s Br. in Opp'n ¶¶ 3, 6. Despite acknowledging a history of hemorrhoids, Monchéry makes the conclusory allegation that the medication prescribed by Dryden was the "only possible source" of his stomach pain and rectal bleeding because he "hadn't had hemorrhoids while in jail." *Id.* ¶ 6.

Applying the standard for deliberate indifference to the facts in this matter, the Court finds that Dryden is entitled to judgment as a matter of law. Even liberally construing Monchéry's complaint to assert a deliberate indifference claim under the Fourteenth Amendment and viewing all facts in the light most favorable to him, the evidence fails to establish that Dryden acted with deliberate indifference in treating Monchéry's knee. *See Martin v. Duffy*, 977 F.3d 294, 298 (4th Cir. 2020) (explaining that at the "summary-judgement stage" the court views the facts "in the light most favorable to the nonmoving party" and liberally reads a pro se plaintiff's pleadings "to raise the strongest arguments that they suggest.").

The Court first considers whether Monchéry's knee injury was objectively sufficiently serious. Certainly, Monchéry alleges that he suffered "mental and emotional distress . . . ,

helplessness, anguish, and pain" related to his knee. Compl. 8. But the evidence presented does not substantiate Monchéry's conclusory, unverified allegations. The NRADC medical records reflect that Monchéry experienced "swelling" and "pain" in his left knee on multiple occasions, but most do not quantify the extent of those symptoms. *See* Med. R. 2–12 (containing general references to "swelling," "knee pain," and "[a]lteration in comfort"). Those that do show only one instance of "moderate" swelling and two instances of "mild" or "diffuse" tenderness. Med. R. 2, 10. Dryden saw "no swelling" on exam in June 2023. *Id.* at 4. The report on Monchéry's knee X-ray at NRADC likewise fails to address the extent of pain or identify any objectively "serious" underlying condition. The radiologist found "no effusion, fracture, dislocation, erosion, or foreign body" and recorded an assessment of "normal left knee and patella." Compl. Ex. 2, at 1; Med. R. 13. Additionally, Monchéry complained of pain only intermittently over nine months and then only after exercise. The Court is thus left with little more than "bare allegations . . . [of] 'pain,'" which "are not sufficient to establish the requisite level of seriousness." *Lowery v. Bennett*, 492 F. App'x 405, 411 (4th Cir. 2012).[8] Nevertheless, even if Monchéry could show that his knee problem was a sufficiently serious medical need, he has not presented evidence to create a material dispute in fact as to the medical care Dryden provided.

Under the Fourteenth Amendment standard for a pretrial detainee, Monchéry must establish that Dryden "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed" or "knew or should have known" that declining to order an MRI or waiting several months to order an X-ray while first attempting other, more conservative treatment "posed an unjustifiably high risk of harm." *Short*, 87 F.4th at

---

[8] Further, while Monchéry filed medical records showing that he received an MRI and meniscal surgery two years after Dryden examined him, ECF Nos. 51, 53, such records cannot establish that Monchéry's "medical need was serious *when he was examined* by" Dryden. *Lowery*, 492 F. App'x at 411.

15

611; *see also id.* at 611–12 ("Negligence was not enough before, and it is not enough now."). Monchéry has put forward no competent evidence to make such a showing.

 The medical records show that Dryden promptly examined Monchéry's knee following each complaint of swelling or pain, monitored Monchéry's knee for signs of improvement or deterioration, and treated the condition with anti–inflammatory medications, a muscle relaxant, and other medications before eventually determining that an X-ray was warranted. For instance, when Monchéry reported "swelling and pain in his knee" to a nurse on January 30, 2023, Dryden saw Monchéry the very next day to examine his knee. Med. R. 2. Likewise, when Monchéry reported "cont[inued] . . . left knee pain" to a nurse on June 11, 2023, Dryden saw him two days later and ordered an X-ray despite concluding that Monchéry's knee was "clinically stable" with no swelling or effusion and only mild tenderness. *Id.* at 4–6. In so far as Monchéry bases his claim on Dryden declining to order an MRI and a "delay" in ordering an X-ray, Monchéry offers no evidence to establish that Dryden's decisions regarding radiological testing constitute deliberate indifference to a serious medical need—or even a "delay." In January 2023, Dryden asserted that his exam findings were "identical" compared to when he first examined Monchéry's knee in September 2022. The evidence thus indicates that Dryden's decisions were simply matters of "medical judgment," which are generally "not subject to judicial review" in the context of a deliberate indifference claim. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). Indeed, analogously, "district courts in the Fourth Circuit have consistently held that deferral of surgery in favor of conservative treatment alone does not amount to deliberate indifference." *Cain v. Mann*, No. 7:22-cv-54, 2024 WL 946035, at *7 (W.D. Va. Mar. 5, 2024) (cleaned up) (collecting cases).

16

In any event, "where a deliberate indifference claim is predicated on a delay in medical care," there is no cognizable constitutional claim "unless the delay *results in some substantial harm* to the patient, such as a marked exacerbation of the prisoner's medical condition or frequent complaints of severe pain." *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (emphasis added); *see Sharpe v. S.C. Dep't of Corrs.*, 621 F. App'x 732, 734 (4th Cir. 2015) (same). Monchéry has offered no evidence that his knee condition worsened or that he experienced "severe" pain—and the required showing is no different in the Fourteenth Amendment context than in the Eighth Amendment context. *See, e.g.*, *Franklin v. Jones*, No. 7:23-cv-481, 2025 WL 734056, at *3 (W.D. Va. Mar. 7, 2025) (finding no deliberate indifference where pretrial detainee alleged that defendant "denied him treatment for his hand and delayed x-rays of his hand" but failed to allege the nature or "extent" of any injury caused by the alleged delay).

Ultimately, the Court agrees with Dryden that Monchéry's claim boils down to a disagreement between a patient and provider about the proper course of diagnosis and treatment, and the Fourth Circuit has "found such disagreements to fall short of showing deliberate indifference." *Jackson*, 775 F.3d at 178; *see, e.g.*, *Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024) (explaining that patient-provider disagreements "do not cut it"); *Farabee*, 131 F.4th at 194 (finding no constitutional right "to specific medication or preferred treatment"); *De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (same). While Dryden elected to pursue a more conservative course of diagnosis and treatment than Monchéry would have liked, the constitutional right to medical diagnosis and treatment is "limited to that which may be provided upon a reasonable cost and time basis and *the essential test is one of medical necessity* and not simply that which may be considered desirable." *United States v. Clawson*, 650 F.3d 530, 538

17

(4th Cir. 2011) (citation omitted) (emphasis added). This is true in the context of a Fourteenth Amendment claim by a pretrial detainee just as it is true in the context of an Eighth Amendment claim by a convicted prisoner. *See, e.g.*, Wright v. Ferguson, No. 7:22-cv-395, 2025 WL 2677900, at *5–6 (W.D. Va. Sept. 18, 2025) (explaining that while pretrial detainee plaintiff "may have preferred more or stronger pain medication," such preference was insufficient to survive summary judgment where the evidence as a whole did not show "defendants intentionally, knowingly, or recklessly acted or failed to act to address his broken jaw").

The recent case of *Hudgins v. Mullins*, No. 7:22-cv-170, 2025 WL 978227 (W.D. Va. Mar. 31, 2025) (Urbanski, J.), is analogous with this case. There, a pro se prisoner plaintiff claiming deliberate indifference under § 1983 had complained of "pain and fluid retention in both knees" to the prison medical provider defendant. *Id.* at *1. The defendant undertook what he acknowledged to be a "conservative" course of treatment involving ibuprofen, knee sleeves, and an X-ray of each knee over "approximately twelve weeks" before the plaintiff was transferred to a different facility. *Id.* at *8. The plaintiff "complained of continued pain and ineffective medication on at least five instances" during the relevant period, X-rays revealed only "mild osteoarthritic changes" and "no acute fracture or dislocation" or "effusion," and the defendant did not refer him to an orthopedic specialist. *Id.* at *1, 8. Months after the plaintiff was transferred out of the defendant's care, an MRI revealed a meniscal tear that ultimately required surgery. *Id.* at *8.

Presented with these closely analogous facts, Judge Urbanksi granted summary judgment for the defendant, holding that no reasonable jury could find that the treatment was "so grossly inadequate" as to constitute deliberate indifference, let alone anything beyond mere negligence. *Id.* at *7. He emphasized that even a plaintiff's disagreement with a "conservative course of

18

treatment" that does "not ultimately relieve symptoms" is insufficient, and that a deliberate indifference claim cannot be judged based on future events or information otherwise unavailable to the defendant during the relevant period. *Id.* at *7–9 (citation omitted).

The same principles apply to this case. Even if Monchéry disagreed with Dryden's course of diagnosis and treatment, and even if the course of diagnosis and treatment was more conversative than Monchéry would have preferred or a different provider would have undertaken, no reasonable jury could find on this record that Dryden "intentionally, knowingly, or recklessly acted or failed to act to address" Monchéry's knee injury and that his actions posed "an unjustifiably high risk of harm." *Short*, 87 F.4th at 611. Dryden's actions were at most negligent, if that, and mere negligence is "not enough" even under the Fourteenth Amendment standard. *Id.* at 612.

Lastly, as to Monchéry's conclusory, unverified allegation that the medication Dryden prescribed caused him stomach pain or rectal bleeding, he has presented no admissible evidence to show such causation. Nor has Monchéry presented evidence that Dryden even knew or had reason to know of such pain and bleeding when it was occurring or that those symptoms were caused by medications Dryden prescribed. *See* Med. R. 5–9 (documenting only appointments with providers other than Dryden for gastrointestinal complaints); *see also Wright*, 2025 WL 2677900, at *6 (granting summary judgment in part because pretrial detainee plaintiff was required to "show that each defendant knew or should have known of the excessive risk posed by his or her inaction" and had failed to show that the defendants were "involved in any way" in the relevant care related to plaintiff's surgery).

IV. Conclusion

In sum, Monchéry raises no genuine dispute of material fact and cannot establish a claim of deliberate indifference against Dryden on the evidence presented, even viewing all evidence in the light most favorable to Monchéry and analyzing his claim under the more lenient Fourteenth Amendment standard. Dryden is entitled to judgment as a matter of law, and his motion for summary judgment, ECF No. 39, will be **GRANTED** and this case dismissed. A separate judgment order shall enter.

ENTER: October 7, 2025

Joel C. Hoppe
U.S. Magistrate Judge